Opinion
BERNSTEIN, Acting P. J .
This case was tried on an agreed statement of facts and stipulation to testimony dated March 24, 1982. The trial court found in favor of the respondent on October 7, 1982, and judgment was entered in the sum of $835.42 damages and $154.73 interest. Thereafter, by stipulation of the parties, the court entered an order correcting a clerical error and amending the judgment nunc pro tunc to the sum of $1,154.27 damages and $235.64 interest. From this adverse decision, appellant, Texaco, Inc., appeals.
The instant action was brought by respondent, Division of Labor Standards Enforcement, Department of Industrial Relations, State of California (hereinafter called the Division). Respondent seeks payment by Texaco of “walkaround pay” for the time spent by several Texaco employees during an industrial safety inspection conducted in 1979 pursuant to section 6314 of the California Labor Code. Texaco contends that it is not required to make such payments because the payments are not explicitly mandated by the state’s Occupational Safety and Health Act of 1973 (hereinafter called Cal-OSHA). Appellant tenders that federal decisions under the Federal Occupational Safety and Health Act (hereinafter called Fed/OSHA) support appellant’s position in the instant case.
The Division, on the other hand, argues that the issue is one of discriminatory practice in violation of Labor Code sections 6310 and 6314, subdivision (d) and that the federal cases cited by Texaco are distinguishable. We agree with the Division and affirm the judgment below.
*Supp. 4 Agreed Statement of Facts and Stipulation to Testimony
See appendix for the full text of the statement.
History of CAL-OSHA
The California Occupational Safety and Health Act of 1973 was enacted partially in response to congressional passage of the federal Occupation and Safety and Health Act of 1970. (29 U.S.C. § 651 et seq.) In order that California not be subjected to the new federal legislation, the state was required to develop its own plan and to submit such plan for federal approval. (See 29 U.S.C. § 667.) Before the Secretary of Labor could approve a state plan, Fed/OSHA required the plan to meet certain specific criteria:
(1) It had to develop standards for safety and health which were at least as effective as the federal standards under 29 United States Code section 655;
(2) It had to provide for the inspection of all work places and include a prohibition on advance notice of inspections;
(3) A state agency or agencies would have to be designated with responsibility to administer the state plan;
(4) The state plan must satisfy the Secretary of Labor that the agencies designated therein would have the authority and trained personnel required for the enforcement of the standards set;
(5) The state was required to show to the satisfaction of the Secretary of Labor that it would devote sufficient funds to enforce the plan’s safety standards;
(6) The state had to assure the Secretary of Labor that it would provide occupational safety and health programs for all employees of public agencies of the state, which programs would be as effective as the standards of any federally approved plan; and,
(7) State employers would be required to make reports to the Secretary of Labor; the state agency would also be required to make such reports (see 29 U.S.C. § 667 et seq.).
California submitted its plan in 1972 and the plan was found to meet the above criteria; approval was forthcoming on April 24, 1973. See 38 Fed.Reg. 10717 (1973).
*Supp. 5 The passage and approval of Cal-OSHA was the culmination of many years of state concern for the problem of safety in employment as demonstrated by the passage of the Workmen’s Compensation Insurance and Safety Act of 1913 which set up an Industrial Accident Commission, and vested it with much of the responsibility which is presently vested in the Division.
The 1913 legislation was superseded by a new and more comprehensive system in 1917, and in 1937 the Labor Code was enacted which then included an entire chapter devoted to “Safety in Employment. ” Safety concerns were again emphasized by the Legislature in 1945 when eight divisions were created within the Department of Industrial Relations and the Division of Industrial Safety was charged with administering and enforcing the adopted safety rules. In 1949, section 6604 of the Labor Code was added giving employees the right to refuse to work where violation of a safety order created a hazard, and further allowed such employees the right to sue for wages lost during the period of any such refusal. See Law of July 21, 1949, Statutes 1949, chapter 1060, section 1. In 1963, section 6416 was added to the Labor Code. This section provided criminal penalties for any employer found grossly negligent with regard to safe working conditions if such negligence caused the death of an employee. See Law of July 1, 1963, Statutes 1963, chapter 1083, section 1.
When California submitted its industrial safety plan to the Secretary of Labor in 1972, the plan was initially “put out” for public comment as required by the Administrative Procedures Act of 1966 (5 U.S.C. § 553(b), (c)). As a result, the California plan was modified to remove provisions allowing possible sanctions against employees for violations of the plan’s safety standards. The modification was believed necessary if employees were to feel free to exercise their statutory right to complain of unsafe conditions without fear of retaliation. (See (1976) 9 Loyola L.A. L.Rev. 913, fn. 76.)
We acknowledge and recite this history because it is important to an understanding of the purpose of Cal-OSHA, the purpose of the inspection procedures required thereunder, and the employees’ contemplated role in those procedures.
Employees Must Be Compensated for “Walkaround Time” Under the California Occupational Safety and Health Act
Essentially, appellant contends that it is not required to pay employee representatives who participate in “walkaround” inspections authorized by Cal-OSHA. This contention is primarily based upon appellant’s reading of *Supp. 6 two decisions of the Federal Court of Appeals for the District of Columbia.[1] (1) Appellant argues that because Cal-OSHA was “modeled after” Fed/OSHA, this court should follow the interpretation appellant claims has been placed on the federal statute by the circuit court. Appellant’s contention might conceivably be more persuasive if the federal construction they ask us to adopt had been rendered before the adoption of Cal-OSHA. However, that is not the case as Leone v. Mobil Oil Corporation (D.C. Cir., 1975) 523 F.2d 1153 was decided in 1975 and the California statute became operational in 1973. In any event, under settled law, the federal cases, although entitled to “considerable respect,” are not binding on this court, Kahn v. Kahn (1977) 68 Cal.App.3d 372, 387 [137 Cal.Rptr. 332], State courts are, of course, always the final arbiters of the meaning of state law. (Meanley v. McColgan (1942) 49 Cal.App.2d 203, 209 [121 P.2d 45].) For the reasons to be discussed below, we conclude that whatever the holdings of the federal decisions construing Fed/OSHA may be (and we do not find these holdings unambiguous), under Cal-OSHA the refusal to pay employee representatives for time spent on walkaround inspections is per se discriminatory, and as such violates the provisions of Labor Code section 6310, subdivisions (a) and (b). Thus, we affirm the trial court’s order.
The walkaround inspection in the instant case was conducted in 1979, pursuant to Labor Code section 6314, subdivision (b).[2] Appellant maintains that: (1) The employees who accompanied the Division’s inspection team were not engaged in compensable activity, and (2) Appellant’s refusal to pay the employee representatives on the second inspection team while they paid the management representatives who accompanied the Division inspection was not an act of discrimination within the meaning of Labor Code section 6310, subdivision (a).[3] Approaching the argument in the order stat *Supp. 7 ed, we will first address the question of whether the employees herein involved were engaged in labor for which they were entitled to collect wages under the law. Appellant’s position is that these employees were on a voluntary mission, or, at least, on business unrelated to corporate concerns.
Appellant, as we have stated, relies heavily upon Leone v. Mobil Oil Corporation, supra, 523 F.2d 1153. The circuit court in Leone held that employees who participated in a Fed/OSHA walkaround inspection need not be compensated. In so holding, the Leone court was deferring to a then-existing regulation of the Secretary of Labor. The regulation stated that refusal to compensate employees who participate in walkaround inspections was not, per se, discriminatory. (See 38 Fed.Reg. 2681, at p. 2684 (1973).)[4] This 1973 regulation of the Labor Department was abrogated in 1977, upon the arrival of the new administration; a new regulation was then promulgated as follows: “The Secretary recognizes the essential nature of employee participation in walkaround inspections under section 8(e) of the Act. Employees constitute a vital source of information to representatives of the Secretary concerning the presence of workplace hazards. Employees should be able to freely exercise their statutory right to participate in walkarounds without fear of economic loss, such as the denial of pay for the time spent assisting OSHA compliance personnel during workplace inspections. Therefore, in order to insure the unimpeded flow of information to the Secretary’s inspectors, as well as the unfettered statutory right of employees to participate in walkaround inspections, an employer’s failure to pay employees for time during which they were engaged in walkaround inspections, is discriminatory under section 11(c). In addition, where employees participate in other inspection related activities, such as responding to questions of compliance officers, or participating in the opening and closing conferences, an employer’s failure to pay employees for time engaged *Supp. 8 in these activities is discriminatory under section 11(c). See 42 Fed. Reg. 47344-47345 (1977).”[5]
The 1977 regulation remained in effect until July 10, 1980, the date of decision in Chamber of Commerce v. O.S.H.A., supra, 636 F.2d 464. Although the decision had the effect of “rescinding” the 1977 directives, the Chamber of Commerce court did not in fact “reach the merits” with regard to “walkaround pay”: “In holding that this regulation is legislative in nature but improperly promulgated, we intimate no view on whether the Assistant Secretary could reissue the same rule after satisfying the requirements of 5 U.S.C. § 553. Only after the full notice-and-comment procedures have run their course will we have a record enabling us to judge whether ordering pay for walkaround time is indeed a statutorily authorized, rational, nonarbitrary, and noncapricious method of supplementing the Act’s provisions. See 5 U.S.C. § 706(2) (1976) [Citations]. We leave that question for another day.” (636 F.2d at 471.)
Thus, in Chamber of Commerce, the court was primarily concerned with the requirement of the Administrative Procedures Act that there be published a notice of proposed rulemaking in the Federal Register. This requirement allows interested parties to submit comments before any final rule is adopted. (5 U.S.C. § 553.)
In Leone v. Mobil Oil Corporation, supra, 523 F.2d 1153, the plaintiff’s action to recover walkaround pay was predicated upon the Fair Labor Standards Act of 1938 (hereinafter, FLSA). (See 29 U.S.C. § 201 et seq.) In addition to showing deference to the then-operative 1973 regulation (see fn. 4, ante), the Leone court relied upon the construction of FLSA enunciated in Tennessee Coal Co. v. Muscoda Local (1944) 321 U.S. 590 [88 L.Ed. 949, 64 S.Ct. 698, 158 A.L.R. 1014], rehearing denied, 322 U.S. 771 [88 L.Ed. 1596, 64 S.Ct. 1257]. The Tennessee case established one test for determining what activities may constitute “hours worked” for the purposes of FLSA. That test required: (1) The activity must require physical exertion; (2) the exertion must be controlled by the employer; and, (3) the exertion must be pursued necessarily and primarily for the benefit of the employer. (See Tennessee, supra, 321 U.S. at p. 598 [88 L.Ed. at p. 956].) The Leone *Supp. 9 court found that accompanying an OSHA inspection was not an activity that fit the Tennessee test, and, as such, did not meet the definition of compensable “hours worked.”
We do not question the correctness of the Tennessee court’s analysis. We do question the appropriateness of applying ELSA work time standards in the context of the Occupational Safety and Health Act. In Marshall v. Ohio Power Company, 8 O.S.C.H. 1322, the court observed, “It is obvious that employer control of employees during an OSHA walkaround would be incongruous with the purpose for their presence.” The inappropriateness of the use of statutory constructions of “worktime” derived from FLSA cases in industrial safety cases such as the one at bench should be obvious.
Contrary to appellant’s contention, it is clear that neither Congress nor the state Legislature has addressed, either directly or impliedly the question of whether employee participation in Cal-OSHA inspections is compensable, and if so, by whom. Further, as respondent points out, unlike the situation in Leone, the instant case involves a rather extensive body of California law defining the nature of the employer-employee relationship. Respondent herein has at no time argued that the monies at issue in the present action are due respondent’s assignors because federal law (e.g., FLSA) requires this. Respondent bases its argument on state law. Although Cal-OSHA is silent on the matter of walkaround pay, this does not justify the inference the Legislature did not intend walkaround time to be a compensable activity. Cal-OSHA, after all, does not deal with compensation. We look instead to the purposes of the legislation. Division 5 of the California Labor Code is entitled “Safety in Employment.” Part I is devoted to occupational safety and health. Section 6300 of the Labor Code announces its purpose as follows: “The California Occupational Safety and Health Act of 1973 is hereby enacted for the purpose of assuring safe and healthful working conditions for all California working men and women by authorizing the enforcement of effective standards, assisting and encouraging employers to maintain safe and healthful working conditions, and by providing for research, information, education, training, and enforcement in the field of occupational safety and health.”
Section 6307 of the Labor Code defines the power and jurisdiction of the Division: “The Division has the power, jurisdiction, and supervision over every employment and place of employment in the state, which is necessary to adequately enforce and administer all laws and lawful standards, or special orders requiring such employment and place of employment to be safe, and requiring the protection of the life, safety, and health of every employee *Supp. 10 in such employment or place of employment.” Further relevant statutes appear below:
Section 6309: “Whenever the division learns or has reason to believe that any employment or place of employment is not safe or is injurious to the welfare of any employee, it may, of its own motion, or upon complaint, summarily investigate the same, with or without notice or hearings. However, when the division secures a complaint from an employee, the employee’s representative, or an employer of an employee directly involved in an unsafe place of employment, that his employment or place of employment is not safe, it shall, with or without notice or hearing, summarily investigate the same as soon as possible, but not later than three working days after receipt of a complaint charging a serious violation, and not later than 14 days after receipt of a complaint charging a nonserious violation. For purposes of this section, a complaint shall be deemed to allege a serious violation if the division determines that the complaint charges that there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use in a place of employment. All other complaints shall be deemed to allege nonserious violations. The division may enter and serve any necessary order relative thereto. The division is not required to respond to any complaint within such period where, from the facts stated in the complaint, it determines that the complaint is intended to willfully harass an employer or is without any reasonable basis.
“The division shall keep complete and accurate records of any such complaints, whether verbal or written, and shall inform the complainant, whenever his identity is known, of any action taken by the division in regard to the subject matter of the complaint, and the reasons for such action. The division shall, pursuant to authorized regulations, conduct an informal review of any refusal by a representative of the division to issue a citation with respect to any such alleged violation. The division shall furnish the employee or the representative of employees requesting such review a written statement of the reasons for the division’s final disposition of the case.
“The name of any person who submits to the division a complaint regarding the unsafeness of an employment or place of employment shall be kept confidential by the division unless that person requests otherwise.
“The requirements of this section shall not relieve the division of its requirement to inspect and assure that all places of employment are safe and *Supp. 11 healthful for employees. The division shall maintain the capability to receive and act upon complaints at all times.”
Section 6310, subdivisions (a) and (b): “(a) No person shall discharge or in any manner discriminate against any employee because such employee has either (1) made any oral or written complaint, to the division, other governmental agencies having statutory responsibility for or assisting the division with reference to employee safety or health, his employer, or his representative, or (2) instituted or caused to be instituted any proceeding under or relating to his rights or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any rights afforded him.
“(b) Any employee who is discharged, threatened with discharge, demoted, suspended, or in any other manner discriminated against in the terms and conditions of such employment by his employer because such employee has made a bona fide oral or written complaint to the division, other governmental agencies having statutory responsibility for or assisting the division with reference to employee safety or health, his employer, or his representative, of unsafe working conditions, or work practices, in his employment or place of employment shall be entitled to reinstatement and reimbursement for lost wages and work benefits caused by such acts of the employer. Any employer who willfully refuses to rehire, promote, or otherwise restore an employee or former employee who has been determined to be eligible for such rehiring or promotion by a grievance procedure, arbitration, or hearing authorized by law, is guilty of a misdemeanor. ”
Section 6311: “No employee shall be laid off or discharged for refusing to perform work in the performance of which this code, including Section 6400, any occupational safety or health standard or any safety order of the division or standards board will be violated, where such violation would create a real and apparent hazard to the employee or his fellow employees. Any employee who is laid off or discharged in violation of this section or is otherwise not paid because he refused to perform work in the performance of which this code, any occupational safety or health standard or any safety order of the division or standards board will be violated and where such violation would create a real and apparent hazard to the employee or his fellow employees shall have a right of action for wages for the time such employee is without work as a result of such layoff or discharge; provided, that such employee notifies his employer of his intention to make such a claim without 10 days after being laid off or discharged and files a claim with the Labor Commissioner within 30 days after being laid off, or discharged or otherwise not paid in violation of this section.”
*Supp. 12 Section 6312: “Any employee who believes that he has been discharged or otherwise discriminated against by any person in violation of Section 6310 or 6311 may, within 30 days after the occurrence of the violation, file a complaint with the Labor Commissioner alleging the discrimination. Upon receipt of the complaint, the Division of Labor Standards Enforcement shall cause such investigation to be made as it deems appropriate. If upon investigation it determines that the provisions of Section 6310 or 6311 have been violated, it shall bring an action in any appropriate court against the person who committed the violation. In any such action the courts shall have jurisdiction, for cause shown, to restrain violations of Section 6310 or 6311 and order all appropriate relief including rehiring or reinstatement of the employee to his former position with back pay.
“Within 30 days of the receipt of a complaint pursuant to this section, the Division of Labor Standards Enforcement shall review the facts of the employee’s complaint, set a hearing date or notify the employee and the employer of its decision, and, where necessary, begin the appropriate court action to enforce such decision.”
Section 6313, subdivisions (a) and (b): “(a) The division shall investigate the causes of any employment accident which is fatal to one or more employees or which results in a serious injury, as defined in subdivision (b) of Section 6409.1 to five or more employees.
“(b) The division may investigate the causes of any other industrial accident or occupational illness which has caused serious injury or which has a substantial probability of causing serious injury, as defined in subdivision (b) of Section 6409.1 and which occurs within the state in any employment or place of employment, or which directly or indirectly arises from or is connected with the maintenance or operation of such employment or place of employment, and shall issue any orders necessary to eliminate such causes and to prevent reoccurrence. Such orders shall not be admitted as evidence in any action for damages, or any proceeding to recover compensation, based on or arising out of such injury or death.”
Section 6314, subdivision (d): “(d) In the course of any investigation or inspection of an employer or place of employment by an authorized representative of the division, a representative of the employer and a representative authorized by his employees shall have an opportunity to accompany him on the tour of inspection. Any employee or employer, or their authorized representatives, shall have the right to discuss safety violations or safety problems with the inspector privately during the course of an investigation or inspection. Where there is no authorized employee representa *Supp. 13 tive, the chief or his authorized representatives shall consult with a reasonable number of employees concerning matters of health and safety of the place of employment.”
The above sections of the Labor Code plainly reveal the remedial purposes of the Cal-OSHA and, further, reveal a statutory scheme which encourages maximum employee participation. What would be the effect of the loss of pay on such participation? One need only look at the stipulated testimony of Texaco employee Tom Lind, (appen., post, at pp. 18-22) wherein Lind indicates he did not want to go on the inspection tour as he had heard he would not get paid for that participation. We know from the stipulated testimony of Thomas Butler, District Manager for the Division and in charge of the inspection of Texaco, that Butler regarded the accompaniment of an employee representative as “critically important” to accurate detection of unsafe and unhealthful condition of employment. It was further stipulated that Mr. Butler would testify that the presence of an employee representative facilitates communication between Division representatives and other employees, makes for a more effective use of the specialists, and saves inspection time.
Aliene Buckner, the Division’s industrial hygienist, testified (by stipulation) that an employee representative was essential for an effective industrial safety survey and that this was especially true in oil refineries; she further stated that employees feel more free to answer questions with regard to the manner in which the tasks are performed, exposure to toxins, and if so exposed, the normal duration of such exposure.
The necessity for employee participation in the walkaround inspection is abundantly clear and is unchallenged. The employee’s right to participation is a statutory one (Lab. Code, § 6314, subd. (d)). The statutory right, however, can be rendered illusory by an employer’s refusal to compensate employees who would exercise that right. If employees are disinclined to participate because of loss of pay and fear of retaliation, not only would the free flow of information between employees and representatives of the Division be impeded, but the entire statutory scheme could be thwarted. In this regard, it is instructive to review some of the comments made by the assistant Secretary of Labor when the 1977 federal regulation was promulgated:
“The right of employees to participate in walkaround is expressly guaranteed by section 8(e) of the Act [Fed/OSHA], which provides that an employee representative shall be given the opportunity to accompany the Secretary’s representative during the physical inspection of any workplace un *Supp. 14 der section 8(a) for the purpose of aiding the inspection. Thus, the right to participate in a walkaround is not a right corollary, nor derived from, the Secretary’s mandate to conduct workplace inspections. Rather it is an employee right expressly granted by the Act, similar to the express employee right to file complaints, whose exercise is protected under section 11(c).
“This express right of employees to participate in the inspection process is crucial to the successful enforcement of the Act. Employee walkarounds are intended to serve as an aid to the Secretary in the performance of his duties and responsibilities under the Act to conduct comprehensive and effective inspections. Employees often are the best sources of information concerning hazardous areas in a workplace, on how machinery operates, and on potential or actual exposure of employees to workplace hazards. This information is essential to enable representatives of the Secretary to determine whether violations of the Act exist and what enforcement action should be taken.
“The wisdom of the congressional judgment to insure open channels of communication between the Secretary and employees has been continually reinforced throughout the six years of enforcement experience. During these years, employee participation and cooperation at the inspection stage has proved to be critically important to enforcement efforts under the Act. Information provided by employees often makes the difference between success and failure in the effort to achieve the illumination of workplace hazards. For example, there are many hazardous conditions which cannot be adequately evaluated by OSHA without information from employees who are familiar with the particular condition in the context of the particular workplace and who transmit this information to the compliance officer during the walkaround. In addition, there have been many instances where employees have informed OSHA during the inspection of hazards which might otherwise not have been detected by the compliance officer. Moreover, the increasingly complex nature of workplace hazards, as in the health area, has imposed greater burdens on the Secretary in detecting these hazards and has correspondingly made the need for employee involvement at the inspection stage even more compelling.
“It is against this statutory background that an employer’s refusal to compensate employees for time spent during the walkaround must be reviewed. This refusal has a twofold and related impact: It is inherently destructive of the employee’s right to participate in walkaround and, consequently, *Supp. 15 impedes the free flow of information between employees and representatives of the Secretary which are so critical to effective enforcement of the Act.
“It is plain that the failure of an employer to pay an employee for time spent during the walkaround will have a strong chilling effect on an employee’s willingness to act as representative of employees during the walk-around. The loss of pay involved would clearly constitute a significant economic disincentive to employees exercising their express statutory right under section 8(e) to accompany a compliance officer during an inspection. Moreover, the failure to pay for walkaround would also interfere with the statutory right of employees to notify compliance officers of hazards prior to and during inspections, a right expressly granted to employees under section 8(f)(2) of the Act.
“The Supreme Court has held, in the context of an unfair labor practice charge of discrimination under section 8(a)(3) of the National Labor Relations Act based on an employer’s refusal to pay striking employees vacation benefits while paying these benefits to non-striking employees, that certain employer conduct may be so ‘inherently destructive’ of employees rights that no specific proof of discriminatory motivation otherwise present in 8(a)(3) proceedings is needed in order to prohibit conduct. NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 34 (1967); NLRB v. Erie Resistor Corporation, 373 U.S. 221, 228, 231 (1963). The failure to pay for walk-around participation is conduct which is ‘inherently destructive’ of employee rights under the Occupational Safety and Health Act.
“When employees are discouraged from present and fixture participation in the walkaround, the open channels of communication between employees and the Secretary are seriously impaired. OSHA compliance personnel would be substantially limited to reliance on information provided by employers—the subject of the investigation—thereby reducing the likelihood of obtaining complete, objective and useful information on workplace hazards. Thus, the failure to pay for walkaround is inherently destructive not only of the employee’s protected rights, but also the entire enforcement scheme of the Act.
“It has further come to the attention of the Agency that management representatives are often paid for the time spent accompanying OSHA representatives during an inspection while employees participating in the same activity are not paid. Thus, an employee of the employer designated by the employer would be paid for time spent on the walkaround while an employee designated by the employee representative would not be paid. Where *Supp. 16 such disparate treatment occurs, it would constitute an independent and additional ground for finding of discriminatory conduct under section 11(c).” (42 Fed. Reg. 47344-47345 (1977).)
We are in full agreement with the assistant Secretary’s comments. The historical efforts to achieve safety in the workplace should not be frustrated.
Appellant contends that even if it had to pay for one employee representative on one OSHA team, it does not have to pay for an employee representative on the second team. The stipulation as to the testimony of Thomas Butler reveals that Butler, the district manager of the Division, made a decision that effective and efficient inspection required that there be two teams. Butler’s stipulated testimony was that there were unusual factors in the instant case that necessitated this decision; he identified those factors as: (1) The size of the plant; (2) the great distances between work stations; (3) the complexity of the operations; (4) the need to complete the inspection as quickly as possible; (5) the need to make the best use of the skills of Ms. Buckner, the Division Industrial Hygienist, and, Division Safety Engineer Robert G. Boyle; and (6) the fact that the employer had assigned representatives to the inspection having specialized industrial hygiene skills and safety engineering skills, respectively, and would be able to assign those representatives to two separate teams without losing its [the employer’s] ability to monitor the Division’s activities (see appen., post, at p. 21).
The two areas of expertise that Butler referred to in his stipulated testimony were safety engineering and industrial hygiene. In the interest of a more expeditious and, we presume, more efficient inspection, the Division required that a second employee representative be assigned to the second team. Even with two teams, the inspection required four and one-half months to complete. We fail to see how the Division’s action prejudiced Texaco, especially since we are required to draw the inference that the inspection would have taken a great deal longer if only a single team had been applied to the task. We draw all factual inferences, as we must, in support of the judgment below.
We also note that Texaco assigned five employer representatives to the OSHA team and that there was never any question but that the five management representatives would not be docked for any time they spent away from their regular assignments, inasmuch as Texaco viewed these employees as representing “employer interests,” in apparent contrast to the employee representatives. We do not agree with Texaco’s view that an OSHA inspection somehow constitutes an “adversary proceeding,” with *Supp. 17 management on one side and employees and the Division on the other. As respondent points out, Congress has explicitly found that: “[Pjersonal injuries and illnesses arising out of work situations impose a substantial burden upon, and are a hindrance to, interstate commerce in terms of lost production, wage loss, medical expenses, and disability compensation payments.” (29 U.S.C. § 651(a).)
Thus, safety benefits inure to employer as well as employee. Furthermore, under Labor Code sections 6400-6405,[6] California employers have an affirmative duty to “furnish employment and a place of employment which are safe for the employees therein.” (See § 6400.) Cal-OSHA’s inspection provisions are, inter alia, intended to aid employers in achieving compliance with these affirmative duties.[7]
Conclusion
We hold that Labor Code sections 6310 and 6314, subdivision (d) require payment of employees, whether they “represent” labor or management, for time spent assisting personnel from the Division in making the inspection tours mandated by Cal-OSHA.
*Supp. 18 The judgment is affirmed.
Cooperman, J., concurred.
Appendix
Agreed Statement of Facts and Stipulation to Testimony
The parties to this action stipulate and agree that the facts recited in the Agreed Statement of Facts may be accepted as true, and that statements of fact and opinions contained in the stipulated testimony herein may be received on the same evidentiary basis as though the named individual appeared and so testified under oath, and that each witness whose testimony is recited herein is competent to so testify and is qualified to render the opinions so offered.
It is further stipulated that the issues presented by the pleadings in the above cause may be determined based upon the following Agreed Statement of Facts and upon the stipulations to testimony:
Agreed Statement of Facts
Between the dates of July 13, 1979 and November 26, 1979 the Division of Occupational Safety and Health of the State of California (hereinafter the “Division” or “Cal/OSHA”), conducted an official safety and health inspection of the Pacific Coast Pipeline and Refinery operated by Texaco, Inc. at 2101 East Pacific Coast Highway, Wilmington, California. Permission to conduct such inspection having been initially refused by Texaco, Inc. (hereinafter “Texaco”) on July 5, 1979, said inspection proceeded under authorization of a warrant describing the premises to be inspected and the scope of the inspection, issued by a judge of the municipal court, Long Beach Judicial District, a true copy of which is attached hereto with the stipulation by the parties that it may be received in evidence herein as Plaintiff’s Exhibit 1.
The period of time initially granted for the inspection was twice extended based upon applications by the Division and the inspection terminated on November 26, 1979. The Division was represented by various compliance safety engineers and an industrial hygienist during the course of the inspection, under the leadership of Mr. Robert G. Boyle. The employer was represented throughout the inspection by Mr. Jack Meadow, Supervisor of Safety, Mr. Melvin Sittel, Supervisor Employee Relations, Mr. Alexander Harris and Mr. Wayne Minge Assistant Supervisors of Safety, Mr. Harmon Fine, Industrial Hygienist. Mr. Harold G. Cook was Chief Steward of the Oil Chemical and Atomic Workers Local No. 1-128 (hereinafter “OCAW”) and member of the Joint Health and Safety Committee and represented the Texaco employees.
On July 16, Mr. Boyle advised the Texaco representatives that the inspection group would stay together unless the Division’s industrial hygienist, Ms. Aliene Buckner, determined that a different procedure was required by particular circumstances which should present themselves, such as the need for sampling or other time consuming study, in which case the *Supp. 19 Division’s inspection team would break up into industrial hygiene and safety components, and that, in any event, the group may need to break up later. Mr. Melvin Sittel objected, indicating that only one employee representative would be supplied by and compensated by Texaco. Mr. Boyle stated that an employee representative should accompany each group. Mr. Sittel disagreed.
On July 18, 1979, OCAW representative Harold Cook requested that Texaco employee, Rudy Peary, be permitted to join the inspection team as an employee representative in addition to himself, asserting that since two or more Texaco management people were assigned to the inspection, the employees were entitled to equal representation. This request was at first denied by Mr. Jack Meadow, but subsequently that day Mr. Meadow said that Mr. Peary would be permitted to join the inspection. That he could go along, but would not be paid for his time by Texaco, and that he would be considered on Union business. Cook protested Mr. Meadow’s position stating Peary was entitled to be paid by Texaco, and that he, Cook, was not requesting Union leave for Peary and was not authorized to do so.
On July 19, 1979, late afternoon Mr. Meadow told Mr. Cook that Texaco would agree to two employee representatives to accompany the two inspection teams.
On the morning of July 20, 1979, Mr. Meadow announced to the Division’s and OCAW’s representatives that he was withdrawing his offer of an additional representative of OCAW to accompany the walkaround inspection. At or about 10:00 o’clock a.m. on July 20, 1979, the Division’s representatives, Boyle and Buckner, determined that, under the guidelines established by their supervisor, Mr. Thomas Butler, District Manager of the Division, that the time was appropriate for them to split up into separate teams; one for safety and one for health. Texaco did release two employees from their normal duties at the refinery to accompany the Division representatives during the safety and health inspection of the refinery for the duration of the inspection, principally Mr. Harold Cook and Mr. Rudy Peary, with substitutions by Mr. Thomas Lind and Mr. Robert Hilliker on the dates and for the times specified.
Attached hereto as Defendant’s Exhibit A is a true and correct copy of the Texaco-OCAW collective bargaining agreement which was in effect at all times material herein and which covered each of plaintiff’s assignors.
That, in addition to the safety committee and safety activities provided for in the collective bargaining agreement between Oil Chemical and Atomic Workers Local 1-128 and Texaco, Inc. for the Wilmington Refinery, bargaining unit employees are compensated for the following activity during which time they are released from their normal production duties;
On one day each month, a “safety walkaround” is conducted by a party consisting of six people; three hourly employees are appointed by management and three hourly people are appointed by Local 1-128. A six hour inspection is conducted after which these inspection team members sit down with department heads and discuss any safety and health problems which they noted during their inspection. This practice has gone on for six or seven years. Texaco has a voluntary agreement with the Red Cross under the terms of which Texaco employees may be informed from time to time of a need for immediate blood donations, and if the employee wishes to respond he may do so, and he is compensated at his normal hourly rate for the time spent in making the donation. One hourly person from each of the 29 departments is permitted to solicit donations for the United Way one day each year and is compensated for the time so spent at his normal hourly rate.
All representatives of the employer during the Cal/OSHA inspection were fully compensated at their normal rate of pay for all hours spent in connection with the safety and health inspection, and all hourly employees of Texaco, including those in job classifications held by Plaintiff’s assignors who performed their assigned duties were compensated therefor by Texaco at their normal rate of pay.
At all times during the inspection of Texaco’s refinery, Texaco paid those hourly employees assigned to an inspection team their regular hourly wages whenever there was only one inspection team under the direction of the Division providing that that employee in question was on the inspection team during his or her regular working shift. Texaco did not pay any hourly employees for time spent on an inspection if that time occurred outside of that employee’s regularly scheduled working hours and would result in the payment of overtime in *Supp. 20 excess of eight hours per days or forty hours in a work week. At no time did Texaco pay any hourly employees whenever the Division assigned those employees to a second inspection team when there was already one inspection team performing.
Meadow, Harris, Minge and Fine are all salaried Texaco employees paid by the month and at no times material herein were hourly employees covered by the collective bargaining agreement. During the times they served on the inspection teams directed by the Division, they continued to perform duties on behalf of Texaco, were agents of Texaco and represented Texaco’s management at the inspection trips around the refinery, although they did not perform the duties they normally would have performed had the inspection not taken place. None of said salaried employees received overtime or extra pay for time spent on inspections during week-ends or evenings.
During the inspection trips directed by the Division, the hourly employee members of the inspection teams were not under the supervision of Texaco’s management; the Division’s agents controlled the inspections.
The following employees claim walkaround pay for time spent during inspections directed by the Division for the number of hours indicated below, and for the total monetary amounts indicated therein:
[[Image here]]
All of the above “straight time” hours represent hours spent by the hourly employees indicated above on second Cal/OSHA inspection teams which working time would have been spent on their normal jobs during their regular shifts.
All of the above “overtime” hours represent hours spent by the hourly employees indicated above on inspection teams which performed Cal/OSHA inspection work on overtime hours in which case employees were held over at the conclusion of their normal scheduled shifts to work evenings or employees were called in to work on Saturdays to perform inspection work beyond their normal scheduled working hours. It is stipulated that inspection during such overtime periods was within the scope of inspection allowed by the Inspection Warrant, Exhibit 1, and extensions thereof.
Stipulation to Testimony
Thomas Butler
It is stipulated that Mr. Thomas S. Butler, if called as a witness would testify that at all times relevant herein, he was employed by the Division as District Manager, and was responsible for directing the conduct of the subject safety and health inspection at Texaco Pipelines and Refinery;
That he has had the District Manager’s responsibility for approximately six years for a territory surrounding the Los Angeles basin in which are situated several major oil refineries. That by reason of this experience he is intimately familiar with the safety and health problems which arise in refinery operations;
That the responsibility for insuring compliance with safety and health regulations of the State of California assigned to the Division under Labor Code sections 6300 et seq. requires the employment of persons having specialized skills in distinct disciplines, and that a principal distinction is made by the Division of Occupational Safety and Health in this regard as between compliance safety engineers and industrial hygienists, the latter being specially trained in recognizing and evaluating employee health hazards arising generally from exposure to substances having toxic or other insidious affects, resulting in what are commonly known as “illnesses” or “diseases” as opposed to the safety engineering disciplines which are directed to detecting and correcting potential causes for injury producing “industrial accidents.”
*Supp. 21 That in formulating a plan to effectively and efficiently conduct the Occupational Safety and Health Inspection of the Texaco Pipeline and Refinery, I determined that several unusual factors dictated that, at some point the industrial hygienist conduct a separate inspection from that of the industrial safety engineer;
That these factors were the size of the plant facilities, the great distances between actual employee work stations within the refinery, the complexity of the operations conducted there, the fact that the employer had assigned representatives to the inspection having specialized industrial hygiene skills and safety engineering skills, respectively and would be able to assign those representatives to two separate teams without losing his ability to monitor the Division’s activities, the need to complete the inspection at the earliest possible time, thus reaching conclusions and indicating what corrections were considered necessary to improve employee safety and health, and last, to make the best use of the specialized skills of Ms. Buckner and Mr. Boyle;
That I therefore determined and informed Ms. Buckner and Mr. Boyle that after an initial familiarization tour they should select an appropriate time to divide into separate teams;
That it has been my experience that the presence of an employee representative accompanying the Division’s industrial hygienist or safety engineer during an inspection is critically important to accurate detection of unsafe and unhealthful conditions of employment inasmuch as the employee representative is familiar with the physical surroundings as well as the nonphysical nonapparent methods of operation, and may help the Division’s representative to relate the conditions observed to the continuity of events which customarily take place, but which may not be immediately observable by the safety engineer or hygienist;
That it has further been my experience that participation by employee representatives facilitates communication between Division representatives and the employees encountered during the inspection, and that such communication both between the employee representative and the working employees and the Division’s representative make more effective use of the hygienist or safety engineers time and actually result in an overall savings of inspection time;
Allene H. Buckner
That Aliene H. Buckner is a qualified, experienced professional Industrial Hygienist, and has been employed in that capacity by the Division for five years, and has conducted approximately five industrial hygiene surveys at oil refineries.
That if called as a witness Ms. Buckner would testify that she considers the participation of an employee representative essential to the conduct of an effective industrial hygiene survey, and that this is particularly true where the place of employment being inspected is an oil refinery;
That among the reasons for her opinion is the fact that important information such as actual manner of task performance by the employee as related to exposure to toxic substances and airborne contaminants, as well as typical duration of exposure and other conditions not readily observable, may not reliably be obtained from any other source, and that, as to matters concerning which there is disagreement between employers and employees, fairness and professionalism dictates that the hygienist’s conclusions be based upon a balanced consideration of both the employer and employee viewpoint;
Ms. Buckner would further testify that it has been her experience that where she is not accompanied by an employee representative during such inspections, but only by an employer representative, employees encountered during the course of the inspection appear to be intimidated from answering questions concerning performance of their tasks, whereas when an employee representative is present employees appear to be more comfortable in speaking to the Division’s representative and in answering questions and occasionally call attention to conditions which concern them, which concerns may then be addressed and satisfied;
Jack Meadow
That Mr. Jack Meadow, if called to testify would testify that at all times relevant herein he was, and now is, Supervisor of Safety at the Texaco, Inc. Refinery in Wilmington, California, known as the Los Angeles Plant, and that during the occupational safety and health inspection by the Division on July 19, 1979, Division safety engineer Robert Boyle was questioning a Texaco foreman (member of management), Mr. Hank Amero, concerning the *Supp. 22 dismantling of certain scaffolding and that when he observed this, Mr. Meadows nudged Mr. Amero and told him not to say anything more to Mr. Boyle;
That on July 20, 1979, Mr. Rudy Peary was an employee representative accompanying Mr. Boyle on the Cal/OSHA safety inspection at the No. 1 Alky Unit, and I observed Mr. Peary to move away from us and talk to a group of employees who were working nearby and ask them if they had anything they needed to report;
That it appeared to me that Mr. J. C. Clavelle had something he wished to say and Mr. Peary handed him a book and pen so that he could write on it;
That when J. C. Clavelle saw me looking at him and saw that I had a camera around my neck he gave the pen and the book back to Mr. Peary;
That throughout the course of the Division’s inspection I frequently made note of the fact that the Division’s representatives paid attention to the employee representatives when the employee representatives asked them to look at various things and from time to time rearranged the inspection schedule so as to respond to the employees’ suggestion that an unusual activity was going on and should be looked at;
That I expressed my concern to the Division’s representatives on several occasions indicating my belief that the union was running the inspection but that the Division people should take charge;
That on July 26, 1979, I telephoned machinist foreman, Richard Ferris and told him to send Thomas Lind to the Training Center to go on the Cal/OSHA inspection. Harold Cook had requested Thomas Lind to serve as the second employee representative to substitute for Rudy Peary who was taking a promotional examination.
Thomas Lind
That Mr. Thomas Lind, if called as a witness herein would testify that on July 26, 1979 he was employed by Texaco, Inc. at its Wilmington Refinery as a No. 1 machinist, and that he reported to work at the machine shop at or about 7:30 a.m., and that at or about this time his immediate supervisor Richard Ferris, told him: “You are supposed to go to the training center to go with the Cal/OSHA people;”
That Lind told Ferris that he did not wish to go and explained: “They said they’re not going to pay us if we do that. ”
That thereupon Mr. Ferris stated: “My instructions are that you are to go over there, so go now.”
That he went and joined the Cal/OSHA people substituting for Rudy Peary who was taking a promotional exam that morning. Harold Cook was the other employee representative that day.
Tom Lind would further testify that he was present as an employee representative during the Cal/OSHA inspection on July 26, 1979, and that at or about 9 o’clock a.m. he conversed with Division safety engineer, Sam Fryfield, and Texaco Safety Supervisor, Jack Meadow, and that during such conversation Tom Lind stated that he and other OCAW representatives were being told by Texaco employees that the Texaco supervisors were going around telling hourly Texaco employees not to talk to Cal/OSHA people;
That this information was not contradicted by Meadow, but rather, Meadow explained that he should understand the feelings of the Texaco staff in view of a previous bad experience with the Cal/OSHA Bureau of Investigation.
Texaco, Inc. further admits the allegations contained in paragraph 4 of Plaintiff’s complaint, and the parties stipulate that the allegations contained in paragraphs 4 and 9 of Plaintiff’s complaint may be and are hereby amended so as to change the dates, hours and monetary amounts to those recited on page 7 hereof, and further waive trial by jury, waive oral argument and agree that the case is submitted based upon this and upon Plaintiff’s briefs.

 The two cases are Leone v. Mobil Oil Corporation (D.C. Cir., 1975) 523 F.2d 1153 and Chamber of Commerce of United States v. O.S.H.A. (D.C. Cir., 1980) 636 F.2d 464.

 Section 6314, subdivision (b): “(b) If permission to investigate or inspect the place of employment is refused, or the facts or circumstances reasonably justify the failure to seek such permission, the chief or his authorized representative may obtain an inspection warrant pursuant to the provisions of Title 13 (commencing with Section 1822.50) of the Code of Civil Procedure. Cause for the issuance of a warrant shall be deemed to exist if there has been an industrial accident, injury, or illness reported, if any complaint that violations of occupational safety and health standards exist at the place of employment has been received by the division, or if the place of employment to be inspected has been chosen on the basis of specific neutral criteria contained in a general administrative plan for the enforcement of this division.

 Section 6310, subdivision (a): “(a) No person shall discharge or in any manner discriminate against any employee because such employee has either (1) made any oral or written complaint, to the division, other governmental agencies having statutory responsibility for or assisting the division with reference to employee safety or health, his employer, or his representative, or (2) instituted or caused to be instituted any proceeding under or relating to his rights or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any rights afforded him. ”

 The text of the 1973 regulation was the following:
“Former Title 29, Section 1977.21 Code of Federal Regulations (1973)
“(a) Complaints involving claims of discrimination based upon employer failure to pay employees who participate in section 8(e) Federal walkaround inspections of a workplace will require close scrutiny of the facts in each instance. However, as a general rule, refusal to compensate the time so spent is not per se discriminatory. On the other hand, there may be situations in which a finding of discrimination would be warranted on the basis of specific facts in the proceeding. For example, an employer’s past practice respecting payment for certain other safety and health activities on regular working time may result in a determination that the failure to compensate for walkaround is discriminatory. Such past practice must entail, however, activities which are closely analogous to walkaround inspection activities. The practice of compensating attendees at safety committee or other safety meetings is not generally to be regarded as evidence of closely analogous practices where such committees and meetings are purely educational and advisory in nature.
“(b) It should be emphasized that an employer is in no way precluded by the Act from making voluntary agreements to pay employees for time spent by them while participating in walkaround inspections.” (38 Fed.Reg. 2684.)

 It would appear from the history of regulations promulgated by the Secretary of the Department of Labor that whether or not payment is required for employees who participate in inspections under the directions of OSHA is a vagarious matter, wholly dependent upon political considerations. Some administrations rule that an employer may refuse to compensate an employee who participates in a walkaround inspection, while others rule that such compensation is required. It is indeed an unfortunate arrangement that an issue of such import to safety in the workplace should be a political football.

 Section 6400: “Every employer shall furnish employment and a place of employment which are safe and healthful for the employees therein.”
Section 6401: “Every employer shall furnish and use safety devices and safeguards, and shall adopt and use practices, means, methods, operations, and processes which are reasonably adequate to render such employment and place of employment safe and healthful. Every employer shall do every other thing reasonably necessary to protect the life, safety, and health of employees.”
Section 6402: “No employer shall require, or permit any employee to go or be in any employment or place of employment which is not safe and healthful.”
Section 6403, subdivisions (a), (b) and (c): “No employer shall fail or neglect:
“(a) To provide and use safety devices and safeguards reasonably adequate to render the employment and place of employment safe.
“(b) To adopt and use methods and processes reasonably adequate to render the employment and place of employment safe.
“(c) To do every other thing reasonably necessary to protect the life, safety, and health of employees.”
Section 6404: “No employer shall occupy or maintain any place of employment that is not safe and healthful.”
Section 6405: “No employer, owner, or lessee of any real property shall construct or cause to be constructed any place of employment that is not safe and healthful. ”

 However, we agree with Texaco that no adverse inference may properly be drawn from the company’s refusal to submit to the Division inspection until such time as a warrant was secured. This was Texaco’s right; its exercise thereof may not in any way prejudice the firm’s position in this litigation.